**Julia Ann DAVIS, et al., Plaintiffs,**

v.

**Jerry E. FLEXMAN, et al., Defendants.**

No. C–3–96–394.

United States District Court,
S.D. Ohio,
Western Division.

Aug. 23, 1999.

Lee Charles Falke, Lee C Falke & Associates, Dayton, OH, for Plaintiffs.

Nicholas D Satullo, Laura M Sullivan, Richard Haber, Reminger & Reminger, Cleveland, OH, W. Michael Conway, Conway & Hall, Dayton, OH, for defendants.

## DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. #41): PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. #40) OVERRULED; CONFERENCE CALL SET

RICE, Chief Judge.

This matter comes before the Court upon the Defendants' Motion for Summary Judgment (Doc. #41) and Plaintiff Joanne Voelkel's Motion for Partial Summary Judgment (Doc. #40). The Defendants seek summary judgment on the Plaintiffs' eleven-count amended Complaint (Doc. #30), which alleges violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181, *et seq.* (Counts I, II, and III); the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* (Counts IV, VI, and IX); Ohio Revised Code Chapter 4112 (Counts V, VII, and X); breach of contract (Count VIII) and conversion (Count XI). Plaintiff Joanne Voelkel seeks summary judgment on her breach of contract and conversion claims. (Counts VIII and XI).

### I. *Factual Background* [1]

The Defendants in this litigation are Jerry E. Flexman ("Flexman"), individually, and Jerry E. Flexman, Ph.D., Inc., d.b.a. the Flexman Clinic. Dr. Flexman serves as the sole shareholder and only officer of the corporation. (Jerry Flexman depo. at 8–9). The Plaintiffs are Joanne Voelkel, a former independent contractor who performed counseling services at the Flexman Clinic, and Julia and Steven Davis, who sought marital counseling from Voelkel. The present dispute stems from Flexman's failure to provide a sign language interpreter for Voelkel's counseling sessions with the Davises, Flexman's termination of Voelkel's independent contractor "affiliate agreement," and Voelkel's contention that she has been compensated improperly under the terms of the affiliate agreement.

Voelkel began working for the Flexman Clinic in November, 1991. (Voelkel depo. at 15). She signed an "affiliate agreement" with the Clinic in 1993. The agreement identified Voelkel as an independent contractor. (*Id.* at 17). It also provided that her compensation would be "50% of collections." (Voelkel affidavit at Exh. A, ¶ 6). Julia and Steven Davis first consulted Voelkel in January, 1996, seeking counseling for marital problems and Julia's depression. (*Id.* at 69). During their first visit, the Davises expressed their need for an interpreter. (*Id.* at 70; S. Davis depo. at 23–24). They explained that Julia Davis particularly needed an interpreter, because she communicated best through sign language and was not proficient with the English language. (*Id.*). Voelkel left a note in Jerry Flexman's office mailbox on January 25, 1996, explaining the Davises' request. (*Id.* at 72–73). She then spoke with Flexman personally on January 29, 1996, and he told her the Clinic had no obligation to provide the Davises with an

---

1. For purposes of reviewing the Defendants' Motion for Summary Judgment (Doc. #41), the Court will view the facts in a light most favorable to the Plaintiffs. When considering Plaintiff Joanne Voelkel's Motion for Partial Summary Judgment (Doc. #40), however, the Court will construe the facts most strongly in favor of the Defendants.

interpreter. (*Id.* at 76). He also questioned who would be responsible for paying for the interpreter. (*Id.*).

Voelkel subsequently called a social services agency, obtained a copy of the ADA, and placed it in Flexman's mailbox. (*Id.* at 78–80). She then met again with the Davises on February 1, 1996, and they renewed their request. (*Id.* at 80). After receiving yet another interpreter request from Julia Davis on February 28, 1996, Voelkel spoke with Flexman on April 5, 1996. (Id. at 82, 85). He told her he still had not read the ADA, but believed the Clinic was not responsible. (*Id.* at 85). Flexman also told Voelkel she could provide the interpreter if she believed the Davises needed one. (*Id.*). Julia Davis then provided her own interpreter for one session. Voelkel told Flexman about the session on May 8, 1996, and explained that having an interpreter present had been beneficial. (*Id.* at 88). Around that time, the Davises also made a formal, written request to the Clinic for an interpreter. (*Id.* at 89). Flexman consulted an attorney about his legal obligation to provide such a person sometime in May, 1996. (Affidavit of Stephen Watring at ¶ 2). The attorney advised Flexman that federal law did not impose an absolute obligation upon the Clinic to provide an interpreter. He opined that the ADA would permit the Clinic to try less expensive alternatives first. (*Id.* at ¶ 3).

Voelkel met with Flexman again on May 10, 1996. (*Id.* at 92). He suggested various "alternatives" to the Clinic paying for an interpreter, and once again stated that Voelkel could pay the expense herself. (*Id.* at 92–93). In late May, 1996, Flexman offered to set up a computer so Voelkel and the Davises could type messages during their counseling sessions. (*Id.* at 98). Voelkel was skeptical that a computer would resolve Julia Davis' problem, given her limited ability to use the English language, but she agreed to try. (*Id.*). The Davises also agreed to try a computer. (*Id.* at 99). On May 31, 1996, the Davises arrived for a counseling session, and no computer was available, even though Flexman knew about the appointment. (*Id.* at 102–103; S. Davis depo. at 32). Voelkel then left a detailed note in Flexman's box explaining why the Davises needed an interpreter. (*Id.* at 100). She spoke with Flexman again about an interpreter on June 3, 1996. He became angry, however, and she once again agreed to try less expensive alternatives first. (*Id.* at 100, 103).

Voelkel went on vacation until mid-June, 1996. (*Id.* at 23). When she returned, she found a letter in her mailbox terminating her affiliate agreement with the Clinic. (*Id.*). The letter was dated June 7, 1996. (*Id.* at 24). Voelkel met with Flexman after receiving the letter, and he agreed to allow her to maintain her relationship with the Clinic until July 31, 1996. (*Id.* at 25). Flexman also told Voelkel that he terminated her affiliate agreement as a result of job performance problems, including her removal of files from the office, and her failure to meet clients and complete paperwork promptly. (*Id.* at 25–26).

Voelkel and Flexman next met on June 24, 1996, and he mentioned having received correspondence from the Davises' attorney. (*Id.* at 103). The correspondence was dated June 5, 1996, and Flexman had received it on June 7, 1996. (Jerry Flexman depo. at 49). During his conversation with Voelkel, Flexman also agreed to set up a computer for the Davises' June 28, 1996, appointment with Voelkel. (*Id.* at 104). When the Davises arrived, however, the computer was not set up, and Voelkel had not heard from Flexman. (*Id.* at 104; S. Davis depo. at 57). The Davises then told Voelkel on July 8, 1996, that they did not want to schedule any more appointments at the Flexman Clinic. (*Id.* at 107). Voelkel subsequently began seeing the Davises on August 28, 1996, in her own private practice. She used a professional interpreter

and paid $39 per hour for the service. (*Id.* at 109–110).[2]

## II. *Summary Judgment Standard*

The Court first will set forth the parties' relative burdens once a motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548. *See also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial[,]" quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 [6th Cir.1987]). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law under Fed.R.Civ.P. 50. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Michigan Protection and Advocacy Service, Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff"). Rather, Rule 56(e) "requires the non-moving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are . . .'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir.1992). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson,* 477 U.S. at 255, 106

---

**2.** The Ohio Bureau of Vocational Rehabilitation now pays the fee for Julia Davis' sign language interpreter. (Voelkel affidavit at ¶ 9, Doc. # 51 at Exh. 3).

S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Procedure* § 2726.

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). *See also, L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ...."), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, upon only those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

III. *Julia Davis' Americans with Disabilities Act Claims (Counts I, II, and III)*

Counts I, II, and III of the Plaintiffs' amended Complaint present causes of action arising under the ADA. In Count I, Julia Davis contends the Defendants violated the ADA by failing to provide, at the Clinic's expense, an interpreter for her

counseling sessions with Voelkel. In Count II, she claims the Defendants violated the ADA by failing to promulgate policies and procedures ensuring effective communication with deaf patients, and to notify deaf patients of those policies and procedures. Similarly, in Count III, she contends the Defendants' failure to promulgate such policies and procedures violates ADA regulations, specifically 28 C.F.R. § 36.202.

Title III of the ADA prohibits discrimination against individuals with a disability in their receipt of services at places of public accommodation.[3] In pertinent part, the Act provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

Unlike actions initiated by the Attorney General, when a private party alleges violations of Title III of the ADA, he or she may receive only injunctive relief, not damages. 42 U.S.C. § 12188; *Jairath v. Dyer,* 154 F.3d 1280, 1283 n. 7 (11th Cir. 1998); *Independent Living Resources v. Oregon Arena Corp.,* 982 F.Supp. 698, 707 (D.Or.1997); *Atakpa v. Perimeter OB-GYN Assoc.,* 912 F.Supp. 1566 (N.D.Ga. 1994). Furthermore, as an initial matter, a private party must establish standing to seek injunctive relief under the ADA. *Jairath,* 154 F.3d at 1283; *Atakpa,* 912 F.Supp. at 1573; *Aikins v. St. Helena Hosp.,* 843 F.Supp. 1329, 1333 (N.D.Cal. 1994).

When a request for injunctive relief is based upon a past wrong, a plaintiff must show a " 'real or immediate threat that the plaintiff will be wronged again-a likelihood of substantial and immediate irreparable injury.' " *City of Los Angeles v.*

---

**3.** The Flexman Clinic qualifies as a "place of public accommodation" under the ADA. *See* 42 U.S.C. § 12181(7)(F) (defining a "place of public accommodation" as including the "professional office of a health care provider, hospital, or other service establishment").

*Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Schroedel v. New York Univ. Med. Ctr.*, 885 F.Supp. 594, 598 (S.D.N.Y.1995) (requiring a plaintiff seeking injunctive relief to show a real or immediate threat that she would be wronged again).

With the foregoing requirements in mind, the Court concludes that Julia Davis lacks standing to seek injunctive relief under Title III of the ADA. Neither Julia nor Steven Davis currently visits the Flexman Clinic, and they do not intend to return in the future. (S. Davis depo. at 61; J. Davis depo. at 29). In addition, the Davises have no plans to seek counseling from anyone other than Voelkel, and she no longer is affiliated with the Flexman Clinic. (S. Davis depo. at 61). Furthermore, Voelkel stated in her deposition that she only would "consider" returning to the Flexman Clinic if its payment of independent contractors underwent "major changes." (Voelkel depo. at 194). Even assuming that Voelkel could demonstrate entitlement to reinstatement, however, she cannot "dictate the conditions under which [s]he should be offered reinstatement." *Cross v. National Trust Life Ins. Co.*, 553 F.2d 1026, 1029–1030 (6th Cir.1977). In any event, Voelkel recently abandoned her request for reinstatement, which was included in her original Complaint (Doc. # 1), but then omitted from her amended Complaint (Doc. # 30).[4]

It is well settled that Julia Davis bears the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). None of the evidence currently before the Court, however, suggests that she faces a real and immediate threat of future discrimination at the Flexman Clinic. Absent some evidence indicating that the Davises are likely to resume marital counseling at the Clinic, Davis lacks standing to seek injunctive relief. *Cf. Atakpa*, 912 F.Supp. at 1574 (finding that the plaintiff lacked standing to seek an injunction under the ADA because she did not allege that she "will ever seek services from the defendants in the future"); *Aikins*, 843 F.Supp. at 1333, 1334 (finding no standing for ADA injunctive relief because the plaintiff "has shown neither that she is likely to use the hospital in the near future, nor that the defendants are likely to discriminate against her when she does use the hospital"); *Hoepfl v. Barlow*, 906 F.Supp. 317, 323 (E.D.Va.1995) ("[A] plaintiff who cannot demonstrate a likelihood that she will ever again suffer discrimination at the hands of a defendant, even one who has discriminated against her in the past, does not have standing to obtain an injunction under the ADA."); *Schroedel*, 885 F.Supp. at 599 (finding that the plaintiff lacked standing to seek an injunction under the ADA absent a "real and immediate threat of repeated injury"); *Naiman v. New York Univ.*, 1997 WL 249970 (S.D.N.Y.1997) (unpublished) (concluding that the plaintiff lacked standing to seek injunctive relief for a sign language interpreter at a hospital, because four prior visits did not demonstrate a "real or immediate threat" of future harm). Consequently, the Court sustains the Defendants' Motion for Summary Judgment (Doc. # 41) with respect to Counts I, II, and III of the Plaintiffs' amended Complaint (Doc. # 30).

## IV. *Julia Davis' Discrimination Claim under the Rehabilitation Act (Count IV)*

In Count IV of the Plaintiffs' amended Complaint, Julia Davis contends that the

---

4. In light of Steven Davis' testimony that the Davises do not plan to seek counseling from anyone other than Voelkel, the likelihood of her returning to work at the Flexman Clinic is relevant to Julia Davis' standing to seek injunctive relief. Indeed, if the record reflected a significant possibility that Voelkel *might* return to the Clinic, then Julia Davis arguably *would* be able to establish a real threat of future harm.

Defendants' failure to provide a sign language interpreter violated § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* Section 504 prohibits recipients of federal funds from discriminating against individuals on the basis of disability. It provides, in pertinent part: "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a).

■ To establish a *prima facie* case under the Rehabilitation Act, Julia Davis must show: (1) that she has a disability; (2) that she was otherwise qualified to participate in a program or activity; (3) that she was excluded from participation in, denied the benefits of, or subjected to discrimination under the program or activity solely on the basis of her disability; and (4) that the program or activity at issue received federal funding. *Maddox v. University of Tennessee,* 62 F.3d 843, 846 (6th Cir.1995); *Howe v. Hull,* 874 F.Supp. 779, 788 (N.D.Ohio 1994). The "program or activity" at issue in the present case is the Flexman Clinic's provision of counseling services.

In their Motion for Summary Judgment, the Defendants present several arguments to demonstrate that Julia Davis cannot establish a *prima facie* case or ultimately prevail on her claim under the Rehabilitation Act. *First,* they question whether the Act applies to the denial of "medical" services. *Second,* they note that the Flexman Clinic received federal funds via Medicaid, but stress that Julia Davis personally did not, thereby suggesting an insufficient "nexus" between the alleged discrimination and the clinic's receipt of federal funding. *Third,* they contend the Rehabilitation Act does not require unduly burdensome accommodation of disabled individuals. The Court will address these arguments in turn.

■ *First,* the Rehabilitation Act frequently has been applied to facilities providing medical treatment. "Although section 504 was initially adopted to give handicapped individuals equal access to employment opportunities and educational programs, it has been applied in the medical context to ensure that individuals are not denied treatment or discriminated against by federally-supported entities because of a disability." *Sharrow v. Bailey,* 910 F.Supp. 187, 193 (M.D.Pa.1995), citing *Woolfolk v. Duncan,* 872 F.Supp. 1381, 1388 (E.D.Pa.1995); *see also Howe,* 874 F.Supp. at 788–789 (finding potential liability under the Rehabilitation Act based upon a doctor's failure to admit an AIDS patient); *Mayberry v. Von Valtier,* 843 F.Supp. 1160, 1163–1164 (E.D.Mich.1994) (finding the Rehabilitation Act applicable to a doctor's failure to provide a deaf patient with a sign language interpreter); *Vacco v. Mid Hudson Med. Group,* 877 F.Supp. 143, 149 (S.D.N.Y.1995) (noting the "long line" of case law holding that a medical clinic's receipt of Medicare and Medicaid reimbursement subjects the clinic to the Rehabilitation Act, and finding the act applicable to a clinic that failed to provide deaf patients with an interpreter for their examinations); *Aikins* at 1337, 1338 (applying the Rehabilitation Act based upon a doctor's admission that he received Medicare and Medicaid payments); *United States v. Baylor Univ. Medical Center,* 736 F.2d 1039, 1042 (5th Cir.1984) (concluding that a medical center's receipt of Medicare and Medicaid constituted "federal financial assistance," bringing it within the scope of the Rehabilitation Act). Moreover, 29 U.S.C. § 794(b)(3) expressly extends the Rehabilitation Act's coverage to any entity receiving federal funds, if that entity is engaged principally in the business of providing, *inter alia,* health care or social services. Consequently, the Court rejects the Defendants' suggestion that the Clinic falls outside the Act's reach.

■ *Second,* the Court finds unpersuasive the Defendants' argument that the Rehabilitation Act does not apply because Julia Davis personally did not participate in the Medicaid program. For purposes of section 504, a "program or activity" that receives federal funds includes "all of the operations of ... an entire corporation, partnership, or other private organization, or an entire sole proprietorship ... which is principally engaged in the business of providing ... health care [or] social services...." 29 U.S.C. § 794(b). If such an organization receives federal funds, it may not discriminate against *any* of its clients, regardless of whether a particular individual is covered by Medicare or Medicaid. *See Sharrow,* 910 F.Supp. at 193 ("It is not necessary that federal funds be received for the care and treatment of the complaining plaintiff. Receipt of federal funding in the form of Medicare or Medicaid payments for the care rendered to any patient brings the treating physician, hospital or medical center within the scope of the Act."); *United States v. Baylor Univ. Medical Center,* 736 F.2d at 1045 (recognizing that "health care facilities and other providers that receive Medicare and Medicaid funds are required, under existing statutes and long-standing Department of Health and Human Services regulations and interpretations, to provide services without discrimination not just to Medicare and Medicaid beneficiaries, but to all patients") (quoting H.R.Rep. No. 98–442; 98th Cong., 1st Sess. 77 (Oct. 26, 1983)); *Howe,* 874 F.Supp. at 789 (reasoning that the "Defendant cannot receive federal funds on the one hand, and on the other deny he is covered by the [Rehabilitation Act] simply because he received no federal funds for his involvement with [the plaintiff]"); *Glanz v. Vernick,* 756 F.Supp. 632, 636 (D.Mass.1991) ("If the ENT Clinic is a program or activity for the purposes of § 504, then it cannot discriminate against any handicapped individuals, regardless of whether they receive Medicaid benefits or not").

■ *Third,* the Court finds some merit in the Defendants' claim that the Rehabilitation Act, by its terms, does not require overly burdensome "accommodation" of disabled individuals. On its face, the statute provides only that a program or activity receiving federal funds shall not exclude from participation, deny benefits to, or subject to discrimination, disabled individuals solely by reason of their disability. Implementing regulations promulgated by the Department of Health and Human Services, however, define the contours of the affirmative obligation to accommodate a disabled individual. *See* 45 C.F.R. Part 84. Such agency regulations, promulgated pursuant to 29 U.S.C. § 794(a), constitute "an important source of guidance on the meaning of § 504." *Alexander v. Choate,* 469 U.S. 287, 304 n. 24, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985).

In the present case, the regulations apply to the Flexman Clinic, because it receives Federal financial assistance in the form of Medicare or Medicaid. *See* 45 C.F.R. § 84.2. In the context of employment discrimination, the regulations require a recipient of federal funds to make "reasonable accommodation" for a handicapped applicant or employee unless doing so "would impose an undue hardship on the operation of its program." 45 C.F.R. § 84.12(a). These accommodations include "the provision of readers or interpreters, and other similar actions." 45 C.F.R. § 84.12(b). Likewise, in the context of post-secondary education, the regulations require academic institutions receiving federal funds to provide "auxiliary aids" for students with impaired sensory skills. 45 C.F.R. § 84.44(d).

Subpart F of 45 C.F.R. Part 84, however, specifically addresses health, welfare, and social services programs and activities that receive federal funds. 45 C.F.R. § 84.51. The Plaintiffs stress that the Rehabilitation Act applies in the present case precisely because the Flexman Clinic provides health care and/or social services. (Doc. # 51 at 19). The Court agrees and

concludes that Subpart F is applicable to the present litigation. Notably, it identifies the extent of a recipient's obligation to accommodate a hearing impaired individual's disability. Specifically, 45 C.F.R. § 84.52(d) states:

"(d) Auxiliary aids. (1) A recipient to which this subpart applies that employs fifteen or more persons shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question."

"(2) The Director [of the Civil Rights office for the Department of Health and Human Services] may require recipients with fewer than fifteen employees to provide auxiliary aids where the provision of aids would not significantly impair the ability of the recipient to provide its benefits or services."

"(3) For purposes of this paragraph, auxiliary aids may include brailled and taped material, interpreters, and other aids for persons with impaired hearing or vision."

Commentary in Appendix A to Part 84 reiterates that a "small provider" of clinical services is not obligated under the Rehabilitation Act to provide auxiliary aids, unless directed to do so by the Health and Human Services Director:

"Section 84.52(d), also a new provision, requires recipients with fifteen or more employees to provide appropriate auxiliary aids for persons with impaired sensory, manual, or speaking skills. Further, the Director may require a small provider to furnish auxiliary aids where the provision of aids would not adversely affect the ability of the recipient to provide its health benefits or service. Thus although a small nonprofit neighborhood clinic might not be obligated to have available an interpreter for deaf persons, the Director may require provision of such aids as may be reasonably available to ensure that qualified handicapped persons are not denied appropriate benefits or services because of their handicaps."

45 C.F.R. Appendix A to Part 84 at Subpart F.[5]

Consequently, pursuant to 45 C.F.R. § 84.52(d), which was promulgated "to effectuate Section 504 of the Rehabilitation Act of 1973,"[6] the Defendants were required to provide Julia Davis with "auxiliary aids," including an interpreter or "other aids,"[7] if the Clinic employed at least 15

---

**5.** Section 84.52(d) has been cited by the federal courts only five times to date. In those rulings, the courts found the provision applicable to health care providers or schools with fifteen or more employees. *See, e.g., Bravin v. Mt. Sinai Med. Center*, 186 F.R.D. 293 (1999), vacated in part, on other grounds, 1999 WL 553786 (S.D.N.Y. July 26, 1999) (citing 45 C.F.R. § 84.52(d) and recognizing that "[i]f the recipient ... employs fifteen or more persons, it 'shall provide appropriate auxiliary aids ...'"); *Proctor v. Prince George's Hospital Center*, 32 F.Supp.2d 820 (D.Md.1998) ("As a recipient of federal funds that employs fifteen or more people, PGHC must also 'provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question.'"); *Naiman v. New York Univ.*, 1997 WL 249970 (S.D.N.Y.1997) ("If the recipient hospital employs fifteen or more persons, it 'shall provide appropriate auxilia-ry aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question.'"); *Garrity v. Gallen*, 522 F.Supp. 171, 217 (D.N.H.1981) (citing § 84.52(d) for the proposition that "not only must recipients refrain from discriminating against handicapped individuals, they must also take an active role in assuring that persons with impairments are afforded 'appropriate auxiliary aids'"); *Jones v. Illinois Dept. of Rehab. Services*, 504 F.Supp. 1244, 1251 (N.D.Ill.1981) (relying upon § 84.52(d) for the proposition that schools must "provide appropriate auxiliary aids, including interpreters, to persons with impaired sensory skills where necessary to afford such persons an equal opportunity to benefit from the service in question").

**6.** *See* 45 C.F.R. § 84.1.

**7.** *See* 45 C.F.R. § 84.52(d)(3).

people, or, if fewer than 15 persons were employed, if the Department of Health and Human Services specifically required the Clinic to provide such aids. Unfortunately, however, the record before the Court does not reveal precisely how many people the Flexman Clinic employed in 1996. In his deposition, Jerry Flexman testified that nine or ten workers moved with him to the Clinic's present address in late 1995. (Flexman depo. at 9–10). His testimony does not make clear, however, whether that figure included only therapists or therapists and clerical employees. (*Id.*). Additionally, Flexman admits using some "independent contractors," such as Voelkel. The Court cannot determine the number of contractors he used, or whether, in practice, they might have qualified as "employees," even though Flexman considered them contract workers.[8] Without this information, the Court cannot say, as a matter of law, that the Clinic had no obligation under the Rehabilitation Act to provide Julia Davis with an interpreter or other auxiliary aids.

In the present case, the parties have not discussed the applicability of 45 C.F.R. § 84.52(d). Instead, they have debated the Defendants' obligation under the Rehabilitation Act to provide an interpreter by referring to the ADA's accommodation requirements. Both statutes prohibit discrimination on the basis of disability. The obligations imposed upon the Defendants under the two statutes, however, are not identical. As the Court has noted, 45 C.F.R. § 84.52(d) defines the extent of the Defendants' obligations under the Rehabilitation Act. A different regulation, 28 C.F.R. § 36.303, implements Title III of

the ADA and defines the obligations imposed upon a "public accommodation" to provide a disabled individual with "auxiliary aids and services." Under 28 C.F.R. § 36.303(a), a "public accommodation" must provide a disabled individual with auxiliary aids, unless it "can demonstrate that taking those steps would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodation being offered or would result in an undue burden, i.e., significant difficulty or expense." Auxiliary aids and services under the ADA include interpreters or other assisted-listening devices. 28 C.F.R. § 36.303(b). Significantly, however, nothing in 28 C.F.R. § 36.303 excludes from the ADA's "auxiliary aid" requirement a public accommodation employing less than 15 workers. Likewise, under the Rehabilitation Act, nothing in 45 C.F.R. § 84.52(d) provides health, welfare, or social service programs with an "undue burden" defense to the provision of auxiliary aids.[9] The applicable Rehabilitation Act regulation, 45 C.F.R. § 84.52(d), provides that health, welfare, and social service programs employing 15 or more people, and receiving federal funds, "*shall* provide appropriate auxiliary aids[.]" *Cf. Bravin v. Mt. Sinai Med. Center,* 186 F.R.D. 293 (1999), vacated in part, on other grounds, 1999 WL 553786 (S.D.N.Y. July 26, 1999) (citing 45 C.F.R. § 84.52(d) and recognizing that "[i]f the recipient ... employs fifteen or more persons, it 'shall provide appropriate auxiliary aids ...' "). Recipients employing less than 15 employees are required to provide such aids only at the direction of the Department of Health and Human Services.[10] Consequently, under

---

8. In an affidavit, Flexman avers that the Clinic had 28 employees and independent contractors in 1994, 15 employees and independent contractors in 1995, and 15 employees and independent contractors in 1997. (Flexman affidavit at ¶ 12). The affidavit is silent regarding the Clinic's employee and independent contractor level in 1996.

9. As the Court noted above, 45 C.F.R. § 84.12 does adopt an "undue hardship" exception to

the Rehabilitation Act's requirement that *an employer* must reasonably accommodate an employee's or applicant's disability. To that extent, the Rehabilitation Act is consistent with the ADA, which provides an "undue burden" defense to an employer to accommodating a disability.

10. Through 45 C.F.R. § 84.52, the Department of Health and Human Services appears to have determined, as a policy matter, that

the applicable Rehabilitation Act regulation, the Court finds the Defendants' alleged financial inability to provide an interpreter of little importance.[11]

In short, the Court finds a genuine issue of material fact precluding summary judgment on Count IV of the Plaintiffs' Complaint. If the Flexman Clinic employed 15 or more employees while Julia Davis visited the Clinic, or if the HHS Director demanded the provision of auxiliary aids,[12] then 45 C.F.R. § 84.52 obligated the Clinic to provide appropriate auxiliary aids to afford Davis an equal opportunity to benefit from her counseling sessions. On the other hand, if the Clinic did not employ 15 or more persons while Julia Davis visited it, and if the HHS Director did not specifically require the Clinic to provide auxiliary aids, then the Rehabilitation Act imposed no such obligation. Based upon the record before it, however, the Court cannot resolve this issue, as a matter of law.[13]

Furthermore, assuming *arguendo* that the Clinic did employ the requisite number of employees, or that the Director of HHS did order the provision of auxiliary aids, the Court finds a genuine issue of material fact as to whether the Defendants met

their responsibility of providing Davis with appropriate auxiliary aids. Construing the evidence in a light most favorable to Julia Davis, a reasonable trier of fact could conclude that the Defendants failed to provide *any* auxiliary aids for the entire six months or so that she visited the Clinic. In her deposition, Voelkel testified that Julia and Steven Davis requested an interpreter in January, 1996, during their first visit to the Clinic. (Voelkel depo. at 70, 72). On January 25, 1996, Voelkel left a note in Flexman's office mailbox mentioning the Davises' request. (*Id.* at 72–73). Voelkel raised the issue with Flexman personally on January 29, 1996, and he expressed his opinion that he had no legal obligation to provide an interpreter. (*Id.* at 76). Steven Davis then contacted Voelkel and requested such a person for the Davises' next counseling session. (*Id.* at 77). Voelkel subsequently obtained a copy of the ADA and placed it in Flexman's mailbox on February 1, 1996. (*Id.* at 80–81).

Julia Davis also made an inquiry with the Ohio Bureau of Vocational Rehabilitation on February 28, 1996, and was told

---

an undue hardship normally would arise if health and social services clinics employing less than 15 workers were required to provide hearing impaired individuals with auxiliary aids.

11. Even considering the Defendants' allegedly precarious financial position in 1996, the Court finds a genuine issue of material fact about whether they could have provided Julia Davis with an interpreter. In an affidavit, Flexman avers that the Clinic reported ordinary income losses of $61,138 in 1994, $575 in 1995, and $1,477 in 1996. (Flexman affidavit at ¶ 9). Flexman also avers that he and his wife reported adjusted gross income of $81,313 in 1994, $49,434 in 1995, and $48,162 in 1996. (*Id.* at ¶ 10). The record also reflects, however, that the Clinic paid its employees and independent contractors salaries, commissions, and wages totaling $298,156 in 1996. (*Id.* at ¶ 11). Additionally, the Clinic's accounts receivable averaged approximately $460,000 monthly from September, 1994, through April, 1996. (*Id.* at ¶ 6). Given these figures, a reasonable trier of fact

could conclude that the cost of providing an interpreter for Julia Davis would not have imposed a significant additional burden upon the Defendants. In her affidavit, Voelkel avers that she currently pays an interpreter $39 per hour for counseling sessions with a deaf patient. (Voelkel affidavit, attached to Doc. # 51 as Exh. 3). Using this figure, the Clinic would have incurred an interpreter expense of $78 per month if the Davises attended counseling every other week, a frequency suggested by Voelkel's deposition testimony. Given the size of the Clinic's operations, a reasonable trier of fact could find this expense relatively insignificant.

12. The parties cite nothing to suggest that the HHS Director ever instructed the Flexman Clinic to provide auxiliary aids.

13. As noted, *supra*, the number of employees who worked for the Flexman Clinic in 1996 will depend, in part, upon whether the Clinic's "independent contractors," such as Voelkel, may have actually qualified as "employees."

that the Clinic had an obligation to provide an interpreter. (*Id.* at 82–83). Thereafter, Voelkel met with Flexman on April 5, 1996, and discovered he had not read the copy of the ADA that she had placed in his mailbox two months earlier. (*Id.* at 85). At that time, Flexman suggested that Voelkel should provide the interpreter herself. (*Id.*). Voelkel spoke with Flexman again on May 8, 1996, and mentioned that Julia Davis had provided her own interpreter for one counseling session. (*Id.* at 88). Around that time, Voelkel also placed in Flexman's mailbox a letter from the Davises formally requesting an interpreter for their counseling sessions. (*Id.* at 89–90). On May 10, 1996, Flexman met with Voelkel, suggested some "alternatives," and once again stated that she could pay for the interpreter herself. (*Id.* at 92–93). Sometime near the end of May, 1996, Flexman told Voelkel that he wanted to try less expensive ways of facilitating her communication with Julia Davis, and that he would set up a computer for them to type back and forth. (*Id.* at 97–98). Voelkel and the Davises were reluctant, but agreed to try Flexman's suggestion. (*Id.* at 99). On May 31, 1996, Voelkel met the Davises for a counseling session, and no computer was available, although Voelkel had told Flexman about the Davises' appointment. (*Id.* at 102–103). On that day, Voelkel left a detailed note in Flexman's mailbox, explaining why the Davises believed an interpreter was needed. (*Id.* at 100).

Thereafter, on June 3, 1996, Voelkel mentioned the interpreter issue to Flexman again. He became angry, and Voelkel agreed to try less expensive means of communication. (*Id.* at 100, 103). Voelkel and Flexman next met on June 24, 1996, and Flexman mentioned receiving correspondence from the Davises' attorney. (*Id.* at 103–104). At that time, Flexman agreed to set up a computer for the Davises' June 28, 1996, appointment. (*Id.* at 104). When the Davises arrived for their appointment, however, the computer

had not been set up, and Voelkel had heard nothing from Flexman. (*Id.*). Finally, on July 8, 1996, the Davises told Voelkel that they did not want to schedule any more appointments with her at the Flexman Clinic. (*Id.* at 107). Accepting the foregoing allegations as true, and construing them in a light most favorable to the Plaintiffs, a reasonable trier of fact could find that the Defendants failed to provide necessary and appropriate auxiliary aids. Consequently, the Court rejects the Defendants' argument that they did not violate the Rehabilitation Act, as a matter of law.

■ In two additional arguments, however, the Defendants contend (1) that Julia Davis lacks standing to obtain injunctive relief under the Rehabilitation Act, and (2) that she cannot recover compensatory damages because Flexman did not intentionally violate the Act. With respect to Davis' standing to obtain injunctive relief, the Court finds the Defendants' argument persuasive. As noted earlier, the record is devoid of evidence suggesting that the Davises are likely to visit the Flexman Clinic again. Absent such evidence, Julia Davis lacks standing to seek injunctive relief under the Rehabilitation Act for the same reasons that she lacked standing under the ADA. *Atakpa,* 912 F.Supp. at 1573; *Aikins,* 843 F.Supp. at 1334; *Trautz v. Weisman,* 846 F.Supp. 1160, 1164–1166 (S.D.N.Y.1994).

■ Nevertheless, the Court rejects the Defendants' argument that Davis cannot recover compensatory damages. In *Moreno v. Consolidated Rail Corp.,* 99 F.3d 782 (6th Cir.1996), the Sixth Circuit recognized a private cause of action for compensatory damages under § 504 of the Rehabilitation Act, *Id.* at 789, and the Defendants do not dispute the general availability of such damages. Rather, they contend Davis must show intentional discrimination, by producing evidence that they were at least "deliberately indifferent" to her rights.[14]

14. Recent case law supports the Defendants' use of the "deliberate indifference" standard

The Defendants argue, as a matter of law, that Davis cannot meet her burden.

Viewing the evidence in a light most favorable to Julia Davis, however, the Court finds a genuine issue of material fact concerning whether Flexman acted with deliberate indifference to the Davises' requests for an interpreter. On several occasions, both in person and in writing, Voelkel conveyed to Flexman the Davises' request for a sign language interpreter. She also provided Flexman with a copy of the ADA, and informed him that she believed he had a legal obligation to provide an interpreter. Two months later, Flexman, who still had not read the ADA, continued to insist that the law did not require him to provide such a person. Eventually, Flexman consulted an attorney and promised to try less expensive accommodations first. Specifically, he agreed to provide the Davises with a computer so that they could type messages back and forth with Voelkel. According to Voelkel, however, Flexman *never* provided a computer. Accepting these facts as true, and construing them in a light most favorable to Julia Davis, a reasonable trier of fact could find that Flexman acted with deliberate indifference to his legal obligations.

■ In a final argument, Flexman contends he cannot be held individually liable under § 504, even if a viable Rehabilitation Act claim exists. After reviewing the statute, the implementing regulations, and relevant case law, the Court finds Flexman's argument persuasive. The Rehabilitation Act prohibits disability discrimination in any "program or activity" receiving federal funds. 29 U.S.C. § 794(a). Section 794(b) defines "program or activity" as, *inter alia,* "an entire corporation, partnership, or other private organization, or an entire sole proprietorship...." 29 U.S.C. § 794(b)(3)(A). In the present case, then, the corporation doing business as the Flexman Clinic constitutes a "program or activity" under the Act. Furthermore, the Clinic itself is the recipient of federal Medicare and Medicaid funds, because it is the "enti-

to prove intentional discrimination. In *Ferguson v. City of Phoenix,* 157 F.3d 668 (9th Cir.1998), the court found compensatory damages unavailable under § 504, absent evidence of discriminatory intent. In so doing, the court sought guidance from decisions addressing the availability of remedies under similar statutes, such as the ADA, Title VI, and Title IX. The court then noted that in the absence of intentional discrimination "substantial corrective measures," such as injunctive relief, remained available to a plaintiff seeking relief under the Rehabilitation Act. The *Ferguson* court refused to decide, however, whether a § 504 plaintiff could prove intentional discrimination by establishing that the defendants had been "deliberately indifferent to the strong likelihood that their action or inaction was violating plaintiffs' federally protected rights." In *Bartlett v. New York State Bd. of Law Examiners,* 156 F.3d 321 (2nd Cir.1998), vacated on other grounds, —— U.S. ——, 119 S.Ct. 2388, 144 L.Ed.2d 790, 1999 WL 66702 (June 24, 1999),the Second Circuit recently addressed the "deliberate indifference" standard in the context of § 504. The court first recognized the "well settled" proposition that intentional violations of the Rehabilitation Act justify an award of money damages. *Id.* at 331. The *Bartlett* court then reasoned that "[i]n the context of the Rehabil-

itation Act, intentional discrimination against the disabled does not require personal animosity or ill will." *Id.,* citing *Tyler v. City of Manhattan,* 118 F.3d 1400, 1406 (10th Cir. 1997). Instead, the court reasoned that "intentional discrimination may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights" will result. *Id.,* citing *Ferguson v. City of Phoenix,* 931 F.Supp. 688, 697 (D.Ariz.1996), *aff'd* 157 F.3d 668 (9th Cir.1998), and *Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Most recently, in *Powers v. MJB Acquisition Corp.,* 184 F.3d 1147 (10th Cir.1999), the court endorsed the Second Circuit's analysis in *Bartlett,* stating: "We agree with the course charted by our sister circuits and hold that entitlement to compensatory damages under section 504 of the Rehabilitation Act requires proof the defendant has intentionally discriminated against the plaintiff. Further, intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *See also Gebser v. Lago Vista Independent School Dist.,* 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (applying the "deliberate indifference" standard in the context of Title IX).

ty that receives the money." *Moreno,* 99 F.3d at 787. Therefore, it must comply with § 504's requirements. *Id.* at 784.

The disputed issue, however, is whether Flexman personally may be liable under § 504 because he made the decision not to provide Julia Davis with an interpreter. Arguing in favor of individual liability, the Plaintiffs cite *United States v. Morvant,* 843 F.Supp. 1092 (E.D.La.1994), and *Howe v. Hull,* 874 F.Supp. 779 (N.D.Ohio 1994). In these cases, the courts found individual liability under the ADA's prohibition against disability discrimination "by any person who owns, leases, (or leases to), or operates a place of public accommodation." The courts reasoned that the individual defendants "operated" a place of public accommodation within the meaning of the ADA.

More importantly, however, in *Howe,* the court found a doctor individually liable under § 504 of the Rehabilitation Act. In so doing, the court noted that § 504 defines a " program or activity" receiving federal funds as *"all of the operations of* . . . [a] corporation, partnership, or other private organization, or an entire sole proprietorship which is principally engaged in the business of providing healthcare . . . *any part of which* is extended Federal financial assistance." *Howe,* 874 F.Supp. at 789 (emphasis in original), quoting 29 U.S.C. § 794(b). Seizing upon the "all of the operations of" and "any part of which" language, the court reasoned that the doctor, in his various capacities at a hospital, was "part of the 'operations of' the hospital." *Id.* Consequently, the *Howe* court found the doctor subject to individual liability.

The Court finds the *Howe* analysis unpersuasive. The "program or activity" language quoted in *Howe* merely recognizes that an entire *entity* or *sole proprietorship* faces potential liability under the Rehabilitation Act if any part of its operations receive federal funding. The definition does not transform an individual into a "program or activity" receiving federal funding simply because his work comprises part of the company's "operations."

Furthermore, the regulations promulgated under § 504 do not define "recipients" of federal funding to include officers or agents of a corporation such as the Flexman Clinic. Rather, "recipient" is defined in relevant part as: "any public or private agency, institution, organization, or other entity, or any person to which Federal financial assistance is extended directly or through another recipient, including any successor, assignee, or transferee of a recipient, but excluding the ultimate beneficiary of the assistance." 45 C.F.R. § 84.3(f). This language is consistent with 29 U.S.C. § 794(b)(3), which defines a program or activity receiving federal funds as an entire *entity* or *sole proprietorship.*[15] In short, nothing in the language of the statute or the implementing regulations indicates the existence of individual liability under the Rehabilitation Act.

Although the Sixth Circuit has not decided the issue of individual liability under § 504, in *Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716 (6th Cir.1996), the court reviewed Title IX, which is nearly identical to the Rehabilitation Act, and noted its "strong skepticism" regarding the existence of individual liability.[16] *Id.* at

15. In the present case, the only "entity" at issue is the Flexman Clinic, which is a corporation.

16. Title IX, 20 U.S.C. § 1681 provides, in pertinent part:

"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any edu-

cational program or activity receiving Federal financial assistance."

Similarly, the Rehabilitation Act, 29 U.S.C. § 794(a), states:

"No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any pro-

728. In a concurrence, one member of the court expressed his belief that Title IX cannot "be read as subjecting anyone other than educational institutions to liability for violation of its terms." *Id.* at 730 (Nelson, J., concurring). Other federal courts have agreed that individual liability does not exist under Title IX. *See Smith v. Metropolitan School Dist.,* 128 F.3d 1014, 1018–1019 (7th Cir.1997) and cases cited therein (concluding that a Title IX suit can be maintained only against a "program or activity" that receives a federal grant, and not an individual); *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 901 (1st Cir. 1988); *Petrone v. Cleveland State Univ.,* 993 F.Supp. 1119, 1125 (N.D.Ohio 1998) (Nugent, J.) (noting that "most of the courts that have addressed the issue of individual liability under Title IX have determined that there is no individual liability because 'program or activity' refers to the educational institution, not to its employees [or] agents"); *Doe v. Petaluma City School Dist.,* 830 F.Supp. 1560, 1576–1577 (N.D.Cal.1993) ("Courts that have addressed the question have held that only institutions may be liable under Title IX, not individuals.").

Likewise, courts construing Title VI, which prohibits racial discrimination, have found no individual liability under that statute. Like Title IX, Title VI contains language almost identical to the Rehabilitation Act. Title VI provides in relevant part: "No person ... shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d. In *Godby v. Montgomery County Bd. of Educ.,* 996 F.Supp. 1390, 1413 (M.D.Ala.1998), the court reasoned that only the entity actually receiving federal funds could be liable under Title VI. *See also Torrespico v. Columbia College,* No. 97 C 8881, 1998 WL 703450 (N.D.Ill. Sept.30, 1998) (concluding that Title VI and Title IX both provide for relief only against a "program or activity," and not an individual).

The Court finds the foregoing authorities persuasive in the present case. As noted above, Title VI, Title IX, and the Rehabilitation Act contain similar language prohibiting discrimination by "programs or activities" that receive federal funding.[17] Furthermore, the Rehabilitation Act expressly provides that the remedies, procedures, and rights set forth in Title VI are available to plaintiffs under § 504. *See* 29 U.S.C. § 794a(a)(2). Title VI, like Title IX, has been construed as providing for liability against only the "program or activity" receiving federal funds. Furthermore, as the Court has explained, nothing in the applicable regulations suggests a broader interpretation of a "program or activity" that receives federal funds under the Rehabilitation Act.[18] Consequently, Jerry Flexman cannot be personally liable under the Rehabilitation Act, because the corporate entity doing business as the Flexman Clinic received federal funding, not Jerry Flexman, individually. Moreover, a contrary holding would result in an anomaly: plaintiffs alleging racial or gender discrimination in violation of Title VI or Title IX would be unable to maintain an individual capacity suit, while a different result would exist for plaintiffs seeking

---

gram or activity receiving Federal financial assistance...."

**17.** In *United States Dept. of Transp. v. Paralyzed Veterans of America,* 477 U.S. 597, 605, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986), the Court recognized the similar nature of Title VI, Title IX, and the Rehabilitation Act, noting that under all three, "Congress enters into an arrangement in the nature of a contract with the recipients of the funds: the recipient's

acceptance of the funds triggers coverage under the nondiscrimination provision."

**18.** To the contrary, 45 C.F.R. § 84.52(d), which pertains to health, welfare, and social service programs, requires a recipient that employs fifteen or more persons to provide appropriate auxiliary aids. In the present case, the "recipient" employer is the Flexman Clinic, a corporate entity.

relief under the analogous language of the Rehabilitation Act. In the Court's view, such a situation is untenable, and not supported by the language of the Act.

In reaching this conclusion, the Court is cognizant that individual liability under the Rehabilitation Act has been found when a person discriminates on the basis of disability and is in a position to accept or reject the federal funding. *See, e.g., Glanz v. Vernick,* 756 F.Supp. 632, 637 (D.Mass. 1991); *Johnson v. New York Hosp.,* 897 F.Supp. 83, 85 (S.D.N.Y.1995); *Lee v. Trustees of Dartmouth College,* 958 F.Supp. 37, 45 (D.N.H.1997); *but see Lane v. Maryhaven Center of Hope,* 944 F.Supp. 158, 164 (E.D.N.Y.1996) (only assuming *arguendo,* for purposes of its analysis, that an individual could be liable under the Rehabilitation Act based upon his role in accepting or rejecting federal funds).

With one exception,[19] the courts finding individual liability under § 504 for persons in a position to accept or reject federal funds have done so by citing, quoting, or paraphrasing language from *Paralyzed Veterans,* 477 U.S. at 606, 106 S.Ct. 2705. Specifically, they rely upon *Paralyzed Veterans'* recognition that "[b]y limiting coverage [under the Act] to recipients, Congress imposes the obligations of § 504 upon those who are in a position to accept or reject those obligations as a part of the decision whether or not to 'receive' federal funds." Relying upon this language, the courts have determined that individuals who make the decision to accept or reject federal funding face individual liability under the Rehabilitation Act. On its face, the quote from *Paralyzed Veterans* supports such a proposition.

A review of the Court's full opinion, however, does not support a finding of individual liability. In *Paralyzed Veterans,* the Court determined that various *entities* it identified as "airport operators"[20] were the "recipients" of federal financial assistance, and not commercial airlines, which merely benefitted from the airport operators' use of the aid. *Id.* at 605–607, 106 S.Ct. 2705. In reaching this conclusion, the Court noted that "Congress limited the scope of § 504 to those who actually 'receive' federal financial assistance because it sought to impose § 504 coverage as a form of contractual cost of the recipient's agreement to accept federal funds." *Id.* at 605, 106 S.Ct. 2705. The Court then noted that the same rationale applied to educational institutions receiving federal aid under Title VI. *Id.* In fact, the Court recognized that under all of "the program-specific statutes, Title VI, Title IX, and § 504, Congress enters into an arrangement in the nature of a contract with the recipients of the funds: the recipient's acceptance of the funds triggers coverage under the nondiscrimination provision." *Id.* Finally, the Court explained that "[b]y limiting coverage to recipients, Congress imposes the obligations of § 504 upon those who are in a position to accept or reject those obligations as a part of the decision whether or not to receive federal funds." *Id.* at 606, 106 S.Ct. 2705.

Significantly, however, *Paralyzed Veterans* did not address the issue of individual liability under § 504. Rather, the Court merely excluded commercial airlines from § 504's definition of "recipient." Although the airlines *benefitted* from the federal funding, the Court noted that they, unlike the airport operators, had not entered into

**19.** In *Chaplin v. Consolidated Edison Co. of New York,* 587 F.Supp. 519 (S.D.N.Y.1984), the court noted that "the question is not free from doubt," but construed § 504 and its implementing regulations, with little discussion, as encompassing employees, officers, and agents under its definition of "recipient." For the reasons set forth more fully herein, however, the Court finds *Chaplin* unpersuasive and declines to follow it.

**20.** The Court's use of the phrase "airport operators" did not refer to any individuals. Rather, it referred to "various entities that own or manage airports and that have authority to apply for planning or development grants...." *Id.* at 599 n. 1 (emphasis added).

an agreement to receive federal funds in exchange for a promise not to discriminate. Thus, the Court concluded that the only those, like the airport operators, "who are in a position to accept or reject" § 504's obligations in exchange for federal funding may be subject to the Rehabilitation Act.

When reviewed in full, the Court's opinion cannot properly be construed as providing for individual liability under § 504. Read in context, the language cited by the other District Courts to find individual liability does not support such a proposition. Individual liability was not at issue in *Paralyzed Veterans*, where the airport operators and the commercial airlines both were entities, not individuals. The Court simply determined that one of the entities, the airport operators, qualified as a "recipient" under § 504, because it had elected to accept federal funding in exchange for its agreement not to discriminate.

Significantly, the *Paralyzed Veterans* Court also recognized the parallel nature of Title VI, Title IX, and the Rehabilitation Act, noting that under each statute the recipient elects to receive federal funding and, in return, agrees to abide by certain non-discrimination requirements. *Id.* at 605, 106 S.Ct. 2705. As noted above, individual liability has been rejected under both Title VI and Title IX. Accordingly, for the reasons stated herein, including the substantially similar language found in the three statutes, the Court finds Jerry Flexman not subject to personal liability under § 504.[21]

The Defendants' Motion for Summary Judgment is sustained in part and overruled in part as it relates to Count IV of the Plaintiffs' amended Complaint. The Motion is sustained with respect to Defendant Jerry Flexman personally, and overruled with respect to the Defendant corporation doing business as the Flexman Clinic.

## V. *Julia Davis' Ohio Revised Code Chapter 4112 Discrimination Claim (Count V)*

█ In Count V of the Plaintiffs' amended Complaint, Julia Davis contends that the Defendants' failure to provide a sign language interpreter discriminated against her in violation of Ohio law. More specifically, she alleges that the Defendants violated Ohio Rev.Code § 4112.02(G), which makes it an unlawful practice:

"(G) For any proprietor or employee, keeper, or manager of a place of public accommodation to deny to any person, except for reasons applicable alike to all persons regardless of race, color, religion, sex, national origin, handicap, age, or ancestry, the full enjoyment of the accommodations, advantages, facilities, or privileges of the place of public accommodation."

In their summary judgment Motion, the Defendants contend § 4112.02(G) does not require them to provide Julia Davis with an interpreter to accommodate her disability. After reviewing the statute and Ohio Admin. Code § 4112–5–02, the Court finds the Defendants' argument persuasive.

Originally, Ohio Rev.Code § 4112.02(G) prohibited a place of public accommodation from discriminating only on the basis of race, color, religion, national origin, or ancestry. *Ohio Civil Rights Comm. v. Lysyj*, 38 Ohio St.2d 217, 313 N.E.2d 3 (1974).

---

**21.** The United States District Court for the Eastern District of Pennsylvania recently reached an identical conclusion in *Fitzpatrick v. Commonwealth of Pennsylvania*, 40 F.Supp.2d 631 (March 25, 1999). In that decision, the District Court recognized the previously mentioned line of cases which found individual liability under the Rehabilitation Act. The *Fitzpatrick* court agreed with the Court's analysis herein, however, concluding that those cases rested upon a flawed interpretation of *Paralyzed Veterans*. *See Fitzpatrick*, 40 F.Supp.2d at 639 (noting that a "questionable reading" of *Paralyzed Veterans* "is in turn the origin of the line of cases holding that individuals can be liable under the Rehabilitation Act").

In *Lysyj*, the Ohio Supreme Court recited the standard for finding unlawful discrimination under the statute: "When determining whether there has been unlawful discrimination under R.C. § 4112.02(G), the test is simply whether the proprietor, keeper, manager or employee of a place of public accommodation has denied any person the full enjoyment of such place for reasons not applicable alike to all persons, irrespective of race, color, religion, national origin or ancestry." *Id.*, 313 N.E.2d at 6. The current version of R.C. § 4112.02(G), however, also prohibits age, gender, and handicap discrimination by places of public accommodation.

Ohio Admin. Code ("OAC") Chapter 4112-5, promulgated by the Ohio Civil Rights Commission, provides an administrative interpretation of § 4112.02(G) and sets forth current standards for compliance. OAC § 4112-5-01. In particular, § 4112-5-06 addresses discrimination against handicapped individuals by places of public accommodation. In relevant part, OAC § 4112-5-06 provides:

"(A) Discrimination prohibited. It shall constitute unlawful discrimination in violation of Chapter 4112 of the Revised Code for any facility which is a place of public accommodation to:

(1) Deny any handicapped person the reasonable access to and use of the areas within such facility which are open to and used by the public in general.

(2) Deny any handicapped person any term, condition, privilege, service or advantage which, upon entrance to such facility, accrues to the public in general. For example, no handicapped person shall be denied, except for reasons applicable alike to all persons regardless of handicap, the full use and employment of:

(a) Recreational or social facilities within such place or public accommodation.

(b) Food services within such facility.

(c) Maintenance services within such facility.

(d) Any service such place of public accommodation is in the business of providing."

In the present case, Julia Davis contends the Defendants' failure to provide a sign language interpreter constituted discrimination in violation of OAC § 4112-5-06(A)(2)(d).[22] Specifically, she claims the Defendants effectively denied her the "service" of marital counseling because she is deaf. In opposition to Davis' claim, the Defendants argue that Ohio Rev.Code Chapter 4112, as construed by OAC § 4112-5-06(A), prohibits a facility that is a place of public accommodation from engaging in affirmative acts discrimination against the handicapped, but does not require such facilities to "accommodate" a handicap beyond making modifications to physical structures.

The language of OAC § 4112-5-06 supports the Defendants' argument. As noted above, the administrative regulations provide that a place of public accommodation shall not deny a handicapped individual the full use and enjoyment of its services except for reasons applicable to everyone. OAC § 4112-5-06(A)(2)(d). On its face, this regulation states only that a place of public accommodation may not, because of an individual's handicap, *deny* that person any term, condition, privilege, service, or advantage that is available to the public in general. In the present case, the Defendants did not deny Julia Davis their counseling services. Rather, she found the services unsatisfactory in the absence of an interpreter.

---

**22.** As an initial matter, the Court notes that the Flexman Clinic qualifies as a "place of public accommodation" under Ohio Revised Code Chapter 4112. *See* Ohio Admin. Code § 4112-5-02 (noting that a "place of public accommodation" includes "all places included in the meaning of such terms as ... dispensaries, clinics, hospitals ...").

Nevertheless, another regulation, OAC 4112–5–06(B), suggests that places of public accommodation have some affirmative responsibility to "accommodate" the handicapped. Significantly, however, the regulation requires a place of public accommodation to "accommodate" *its facilities* for use by the handicapped, and the regulation's guidelines refer to physical accommodations to facilities and structures. For example, OAC § 4112–5–06(B) provides:

"(B) Reasonable accommodation. Whether a place of public accommodation has reasonably accommodated its facility for use by the handicapped shall be determined on a case-by-case basis; however, the following factors will be considered:

(1) Whether parking spaces for the handicapped are provided in close proximity to the building entrance.

(2) Whether walkways from such parking spaces have been made accessible to the handicapped.

(3) Whether steps at building entrances have been supplemented by means of access to the building entrance, such as by ramps or by sloped grading.

(4) Whether public entrance doorways provide the handicapped with reasonable access to such building.

(5) Whether public telephones, lavatory facilities, water fountains, elevators, corridors, vending machines, stairways, food service lanes and aisles, utility outlets of frequent or essential use, and other similar facilities within such place of public accommodation are accessible to the handicapped."

Other parts of the public accommodation regulations also suggest that OAC § 4112–5–06 only requires accommodation to facilities and structures. For example, OAC § 4112–5–06(C) places the burden of proof on the owner, proprietor, keeper, or manager of a place of public accommodation to prove "undue hardship" whenever a handicapped person is denied *access* to the facility. Likewise, OAC § 4112–5–06(D),

which discusses the "undue hardship" defense, includes language suggesting that the duty to accommodate is limited to making physical changes to the structure or facility. OAC § 4112–5–06(D) provides:

"(D) Undue hardship. Upon an owner's, proprietor's, keeper's or manager's claim of inability to accommodate the handicapped due to undue hardship, the following factors will be considered:

(1) Business necessity.

(2) Whether the cost of the accommodating the handicapped would be substantially disproportionate to the total cost, use or size of such place of public accommodation.

(3) Whether or not it is architecturally feasible to make reasonable accommodation.

(4) The requirements of other laws and contracts.

(5) Other appropriate considerations the proprietor, keeper or manager of the place of public accommodation can support with objective evidence."

The Court also finds strong support in OAC § 4112–5–02(A) for its conclusion that OAC § 4112–5–06 does not require a place of public accommodation to provide an interpreter. That definition section states: "When used in Chapter 4112 of the Revised Code and Chapters 4112–5 to 4112–7 of the Administrative Code: (A) 'Accommodation' means a reasonable adjustment made to a job and/or the work environment that enables a qualified handicapped person to safely and substantially perform the duties of that position." This definition, which is applicable to OAC § 4112–5–06, the public accommodation regulation, suggests that a *place* of public accommodation must ":accommodate" the handicapped in the employment context.

Unlike the implementing regulations for the ADA and the Rehabilitation Act, nothing in OAC § 4112–5–06 requires a place of public accommodation to provide auxiliary aids, such as an interpreter, for deaf

individuals. Rather, as explained above, the regulation requires, as an accommodation, some modification of the relevant facilities and identifies various structural considerations. It also provides an undue hardship defense when a handicapped individual is denied "access" to a facility. Finally, the definition of "accommodation" found in OAC § 4112–5–02(A) suggests that accommodations must be made to facilitate the employment of handicapped individuals. In short, the language and organization of OAC § 4112–5–06, and the definition of "accommodation" found in OAC § 4112–5–02(A), convince the Court that Ohio Rev.Code § 4112.02(G) did not obligate the Defendants to provide Julia Davis with an interpreter.[23]

In opposition to this conclusion, Davis argues that the Court should construe Ohio Rev.Code § 4112.02(G) as analogous to the Rehabilitation Act. In support, she cites *Ohio Civil Rights Comm. v. Case Western Reserve Univ.*, 76 Ohio St.3d 168, 666 N.E.2d 1376 (1996). In that case, the Ohio Supreme Court borrowed the definition of "otherwise qualified" found in the Rehabilitation Act to define the phrase "otherwise qualified handicapped person" under Ohio law, which provided no appropriate definition. *Id.* 666 N.E.2d at 1383.

Although the Rehabilitation Act is a relevant consideration when considering the requirements of Ohio Rev.Code § 4112.02(G), the Court declines the Plaintiffs' invitation to read the two statutes in *pari materia.* Significantly, the Rehabilitation Act's implementing regulations expressly require auxiliary aids for deaf individuals in some cases. The Ohio Civil Rights Commission regulations defining the contours of Ohio Rev.Code § 4112.02(G), however, contain no such requirement. In fact, as the Court has ex-

plained, the Ohio regulations suggest the absence of such a requirement. As a result, the Court declines to read § 4112.02(G) as requiring a place of public accommodation to provide auxiliary aids for the deaf simply because, under limited circumstances, the Rehabilitation Act imposes such a requirement. Having found the Defendants not obligated, under Ohio Rev.Code § 4112.02(G), to provide Julia Davis with an interpreter, the Court sustains the Defendants' Motion for Summary Judgment (Doc. # 41) as it relates to Count V of the Plaintiffs' amended Complaint (Doc. # 30).

## VI. *Steven Davis' Claims under 29 U.S.C. § 794 and Ohio Rev.Code § 4112.02 (Counts VI and VII)*

In Counts VI and VII of the Plaintiffs' amended Complaint, Steven Davis asserts claims against the Defendants for "loss of society, services, conjugal relations, spousal affection and spousal companionship...." These derivative claims are grounded in Julia Davis' allegations of disability discrimination in violation of the Rehabilitation Act and Ohio Revised Code Chapter 4112.

In their Motion for Summary Judgment, the Defendants reason that Steven Davis' claims must fail as a matter of law because Julia Davis' underlying claims lack merit.[24] With respect to Count VI of the Plaintiffs' amended Complaint, the Court finds the Defendants' argument persuasive in part. As noted above, the Court cannot say, as a matter of law, that the Flexman Clinic did not violate the Rehabilitation Act by refusing to provide Julia Davis with an appropriate auxiliary aid. Consequently, Steven Davis' derivative claim against the Flexman Clinic in Count VI survives summary judgment. The Court has found Jerry

**23.** In reaching this conclusion, the Court notes the complete absence of Ohio case law construing OAC § 4112–5–06.

**24.** In their Memorandum in support of summary judgment, the Defendants incorrectly characterize Counts VI and VII as asserting

derivative claims under the ADA and the Rehabilitation Act. In reality, Count VI states a derivative claim under the Rehabilitation Act, and Count VII states a derivative claim under Ohio Revised Code Chapter 4112.

Flexman not personally liable under the Rehabilitation Act, however. Accordingly, Flexman is entitled to summary judgment on Count VI.

The Court finds both Defendants entitled to summary judgment, however, on Count VII, in which Steven Davis asserts a derivative claim premised upon Ohio Revised Code Chapter 4112. In its prior analysis, the Court determined that Julia Davis could not maintain a cause of action against the Defendants for failure to accommodate in violation of Chapter 4112. Consequently, the Court finds Steven Davis equally unable to maintain his derivative claim under the statute. Accordingly, the Defendants' Motion for Summary Judgment (Doc. # 41) is sustained with respect to Count VII of the Plaintiffs' amended Complaint (Doc. # 30).

### VII. *Joanne Voelkel's Breach of Contract Claim (Count VIII)*

In Count VIII of the Plaintiffs' amended Complaint, Joanne Voelkel alleges that the Defendants breached her affiliate agreement by not paying her properly. The parties have filed cross motions for summary judgment on this claim.

In their Motion, the Defendants argue that Voelkel has received all money owed to her under the affiliate agreement. (Doc. # 41). In her Motion, however, Voelkel characterizes her breach of contract claim as one for "negligent billing." (Doc. # 40). She argues that the Defendants breached their duty to bill certain insurance companies for work she performed, and also breached their duty to credit her account accurately when the Clinic received payment. (Doc. # 40 at 8). Furthermore, she argues that the Defendants' breach of their duty proximately caused her harm in the form of lost income. (*Id.*).

In response, the Defendants first note that the amended Complaint (Doc. # 30) includes a claim for breach of contract based upon their alleged failure to pay

Voelkel according to the terms of the affiliate agreement. They stress that the amended Complaint *does not* include a negligence claim, and that Voelkel has not moved to re-amend the Complaint to add a cause of action for negligence. As a result, the Defendants contend the breach of contract claim is governed by the law of contract, not tort law. The Defendants also contend the record is devoid of evidence indicating that they received any payment for Voelkel's services which was not shared with her pursuant to the affiliate agreement.

In her Reply memorandum (Doc. # 55), Voelkel argues that the Defendants have not compensated her as required by the affiliate agreement. Specifically, she alleges that on "multiple" occasions, insurance companies paid the Clinic for her work, but she was not paid. Furthermore, Voelkel attempts to recast her "negligent billing" argument as a true contract-based claim rather than one sounding in tort. She argues that the affiliate agreement imposed upon the Clinic a contractual obligation to bill for her work, and to bill correctly. In support, Voelkel relies upon a sentence in the affiliate agreement that states: "All services will be coordinated with the Flexman Clinic." (Affiliate agreement at ¶ 3).

Having reviewed the record, the Court finds that the breach of contract claim is controlled by principles of the law of contract, rather than tort law. Count VIII of the Plaintiffs' amended Complaint alleges that the Defendants breached the affiliate agreement by failing to pay Voelkel all funds owed to her under the agreement. (Doc. # 30 at ¶ 48). In turn, the affiliate agreement sets forth the extent of the Defendants' obligation to pay Voelkel, stating: "The counselor will be reimbursed at 50% of collections." (Voelkel affidavit at Exh. A, ¶ 6). Consequently, by the terms of her agreement, Voelkel can recover under her breach of contract theory only if the Clinic received compensation for her work. Nothing in the agreement obligates

the Defendants to compensate Voelkel when the Clinic itself has not received compensation for her counseling services.

Voelkel's reliance upon language in the affiliate agreement to support her breach of contract claim is misplaced. The quoted sentence states that "[a]ll services will be coordinated *with* the Flexman Clinic." (Emphasis added) (Voelkel affidavit at Exh. A). This sentence cannot reasonably be read as imposing upon the Defendants a contractual obligation to pay Voelkel for services she performed, based upon a "negligent billing" theory, even though the Clinic has not received compensation for her work. Rather, the language appears to impose upon Voelkel an obligation to coordinate *her* services *with* the Flexman Clinic. As the Defendants properly note, if Voelkel had desired to be paid based upon a percentage of fees generated or billed, rather than fees collected, she should have negotiated a contract with the Defendants including those terms. Absent such language in the affiliate agreement, Voelkel cannot engraft a tort duty into the agreement and, in so doing, vary its terms. Consequently, Voelkel's breach of contract claim is limited to any funds the Clinic received for her work but failed to share with her.

Contrary to the Defendants' argument, however, the record contains evidence supporting Voelkel's claim that she was not paid 50 percent of all fees received for her work. In an affidavit, Voelkel avers that she has compared subpoenaed insurance company records with monthly printouts she received from the Flexman Clinic. (Third Affidavit of Joanne Voelkel at ¶ 3¢—5, attached to Doc. # 55). Voelkel further avers that the comparison revealed "a large number of sessions" for which she was not compensated. (*Id.* at ¶ 4). Specifically, Voelkel avers that, based upon her comparison, the Flexman Clinic received at least $5,267.77 and failed to compensate her pursuant to the affiliate agreement. (*Id.* at ¶ 5). In support, she has attached to her affidavit documents

suggesting that the Clinic received payments from an insurance company but failed to credit her account. (*Id.* at Exh. 1,2). Voelkel also avers that the Clinic billed the insurance company under Jerry Flexman's provider number rather than her own. (*Id.* at ¶ 7).

In addition, when construed in a light most favorable to Voelkel, Flexman's deposition testimony suggests that she might not have been paid her share of all fees the Clinic received as a result of her work. In his deposition, Flexman acknowledged instances when the Clinic submitted claims to insurance companies, using his provider number for work Voelkel had performed. (Flexman depo. at 96–100). He also acknowledged that the Clinic had received a $70 payment for Voelkel's work on June 10, 1996, and that the payment had not appeared in the Clinic's records by July 17, 1996. Although these facts do not prove that the Defendants failed to pay Voelkel as required by the affiliate agreement, they do support her claim.

Consequently, viewing the evidence in a light most favorable to Voelkel, and drawing all reasonable inferences in her favor, the Court finds a genuine issue of material fact precluding summary judgment on her breach of contract claim. The record contains evidence from which a reasonable trier of fact could conclude that the Defendants received compensation for Voelkel's services and failed to share the income with her as required by the affiliate agreement.

On the other hand, the record also contains evidence from which a reasonable trier of fact could conclude, viewing the evidence in a light most favorable to the Defendants, that the Clinic does not owe Voelkel any money under the affiliate agreement. In an affidavit, Janet Flexman avers that her responsibilities with the Flexman Clinic included billing and collection. (J. Flexman affidavit at ¶ 1, attached to Doc. # 44). With one minor exception, she claims to be unaware of any fee received by the Clinic for Voelkel's

work that was not shared with Voelkel. (*Id.* at ¶ 11).[25] Furthermore, the Clinic's use of Jerry Flexman's provider number for Voelkel's sessions does not establish that the insurance carrier ever paid the Clinic, or that Voelkel was not compensated despite the use of Flexman's number. Likewise, the Clinic's failure to record promptly a $70 payment received for Voelkel's work does not establish that Voelkel never received credit for the payment.

The foregoing examples are illustrative of the evidence before the Court. Given the state of the evidence, the Court, finds a genuine issue of material fact precluding summary judgment for either Voelkel or the Defendants on her breach of contract claim. Accordingly, the Defendants' Motion for Summary Judgment (Doc. # 41) is overruled as it relates to Count VIII of the Plaintiffs' amended Complaint. (Doc. # 30). Plaintiff Joanne Voelkel's Motion for Partial Summary Judgment (Doc. # 40) is also overruled as it relates to Count VIII of the Plaintiffs' amended Complaint. (Doc. # 30).

VIII. *Joanne Voelkel's Retaliation Claim Under the Rehabilitation Act (Count IX)*

 In Count IX of the Plaintiffs' amended Complaint, Joanne Voelkel contends that the Defendants' termination of her affiliate agreement constituted retaliatory discharge in violation of the Rehabilitation Act. In response, the Defendants seek summary judgment on Voelkel's retaliation claim, raising a number of arguments. *First,* they contend Voelkel lacks standing to maintain her claim because she is not disabled and, therefore, not protected by the Act. *Second,* they argue that Voelkel lacks standing because the Clinic did not receive Medicare or Medicaid funding as a result of the Davises' counseling

sessions. *Third,* the Defendants argue that they have presented legitimate, non-discriminatory reasons for terminating Voelkel's affiliate agreement, and that she cannot demonstrate pretext. *Fourth,* they claim Voelkel cannot prevail, given the Clinic's office closings and staff reductions, because her contract would have been terminated in any event.

After reviewing the record and applicable law, the Court finds unpersuasive the Defendants' arguments that Voelkel lacks standing to maintain her retaliation claim. Voelkel's lack of a disability does not deprive her of standing to bring a claim for retaliation under the Rehabilitation Act. In *Texler v. County of Summit Bd. of Mental Retardation and Developmental Disabilities,* 25 F.3d 1050, 1994 WL 252938 (6th Cir. June 8, 1994) (unpublished table decision), the court recognized that a plaintiff "need not demonstrate that she was handicapped in order to prove that her employer took retaliatory action against her" after she engaged in protected activity. *Id.* 1994 WL 252938, at *4, citing *Bigge v. Albertsons, Inc.,* 894 F.2d 1497, 1503 (11th Cir.1990) (noting that to support a retaliation claim, a plaintiff must show only that he opposed an unlawful employment practice that he reasonably believed had occurred or was occurring); *see also Hoyt v. St. Mary's Rehabilitation Center,* 711 F.2d 864, 867 (8th Cir.1983) (finding that non-disabled individuals who make complaints under the Rehabilitation Act may maintain a cause of action for retaliation); *Whitehead v. School Bd. for Hillsborough County,* 918 F.Supp. 1515, 1522 (M.D.Fla.1996) ("Under the regulation, retaliatory acts are prohibited against persons who complain of unlawful discrimination in violation of § 504 on behalf of a handicapped individual. There is no limitation under the regulation that retaliatory acts are only prohibited against the handicapped individual on whose behalf the § 504 complaint is being

---

**25.** In her affidavit, Janet Flexman acknowledges that Voelkel is owed one-half of a "small check" the Clinic received in March, 1998. (*Id.* at ¶ 11). She states, however, that

the Internal Revenue Service has asserted a claim against Voelkel's share of the money, and that Voelkel has not responded to the Clinic's inquiries into the matter. (*Id.*).

raised. Therefore, persons who claim to suffer from retaliation do not need to show that they are ... handicapped...."); *Ross v. Allen*, 515 F.Supp. 972, 976 (S.D.N.Y.1981) (reasoning that a non-disabled individual who complains about alleged violations of the Rehabilitation Act has standing to bring a retaliation claim, "[b]ecause she is in the 'zone of interests' meant to be protected by § 504 and [the] regulations and because she has suffered 'injury in fact' ").

Furthermore, as the Court explained in its analysis of Julia Davis' Rehabilitation Act claim, Voelkel need not show that the Davises participated in Medicare or Medicaid reimbursed activities. Voelkel possesses standing because the Clinic participates in the Medicare/Medicaid program. *See Sharrow*, 910 F.Supp. at 193 ("It is not necessary that federal funds be received for the care and treatment of the complaining plaintiff. Receipt of federal funding in the form of Medicare or Medicaid payments for the care rendered to any patient brings the treating physician, hospital or medical center within the scope of the Act.").

The remaining issue, then, is whether a triable question of fact exists on the merits of Voelkel's retaliation claim. A plaintiff alleging retaliation may support the claim with direct evidence of discrimination or, alternatively, by satisfying the inferential test articulated in *McDonnell Douglas v. Green*, 411 U.S. 792, 801, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In the present case, Voelkel presents no direct evidence that the Defendants retaliated against her because she objected to Flexman's failure to provide Julia Davis with an interpreter. Consequently, the Court will proceed with a *McDonnell Douglas* analysis.

Under that approach, Voelkel first must establish a *prima facie* case of retaliation. The Defendants then must offer evidence of a legitimate non-discriminatory reason for their actions. Finally, Voelkel must prove that the Defendants' proffered reasons are a pretext for retaliation. *Cf. Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir.1987) (applying the burden-shifting framework set forth in *McDonnell Douglas* to a retaliation claim arising under the Surface Transportation Assistance Act, 49 U.S.C. § 2305 (1982)); *Perkovich v. Roadway Express, Inc.*, 106 F.3d 401, 1997 WL 26457 (6th Cir. Jan.22, 1997) (unpublished table decision) (recognizing that the *McDonnell Douglas* analysis "has been held to apply to retaliatory discharge cases").

■■■ To state a *prima facie* claim of retaliation, a plaintiff must show: (1) that she engaged in protected activity under the Rehabilitation Act; (2) that she was the subject of adverse employment action; and (3) that a causal connection exists between the protected activity and the adverse action. *Johnson v. U.S. Dept. of Health and Human Services*, 30 F.3d 45, 47 (6th Cir.1994) (discussing retaliation under Title VII).

■■■ In the present case, Voelkel has established a *prima facie* case of retaliation. On several occasions, she spoke with Flexman or left him messages objecting to his failure to provide Julia Davis with an interpreter. She also provided him with a copy of the Americans with Disabilities Act and told him that his failure to provide an interpreter might violate federal law. By championing Julia Davis' request for an interpreter, the Court finds that Voelkel engaged in protected activity under the Rehabilitation Act.[26] Further-

---

26. The Rehabilitation Act does not expressly include a cause of action for retaliation. The Act incorporates by reference, however, the anti-retaliation provisions of Title VI. *See* 29 U.S.C. § 794a(a)(2) ("The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.] shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."). *See also* 45 C.F.R. § 84.61, promulgated under the Rehabilitation Act and

more, Flexman's termination of her affiliate agreement cannot be construed as anything other than an adverse employment action. Finally, the timing of Flexman's decision to terminate the agreement, just two days after he became "angry" with Voelkel for pressing him about an interpreter,[27] raises an inference of retaliation and satisfies the "causal connection" requirement of Voelkel's *prima facie* case. *Wrenn v. Gould,* 808 F.2d 493, 501 (6th Cir.1987) (recognizing that "causal connection" "may be demonstrated by the proximity of the adverse action to the protected activity"); *Moon,* 836 F.2d at 229 (stating that "the proximity in time between protected activity and adverse employment action may give rise to an inference of a causal connection"); *Tennessee Valley Authority v. Frady,* 134 F.3d 372, 1998 WL 25003 (6th Cir. Jan.12, 1998) (unpublished table decision) (citing *Moon* for the proposition that "[w]here adverse employment action follows rapidly after protected activity, common sense and case law allows [sic] an inference of a causal connection").

 Voelkel's presentation of a *prima facie* retaliation case shifts the burden of production to the Defendants to rebut the presumption of retaliation with evidence that Flexman terminated her affiliate agreement for a legitimate, non-discriminatory reason. *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078,

---

incorporating 45 C.F.R. § 80.7(e), a Title VI anti-retaliation provision, which states:

"Intimidatory or retaliatory acts prohibited. No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part. The identity of complainants shall be kept confidential except to the extent necessary to carry out the purposes of this part, including the conduct of any investigation, hearing, or judicial proceeding arising thereunder."

The foregoing language makes actionable retaliation against individuals who voice complaints on behalf of the disabled. *Hoyt,* 711 F.2d at 867; *Ross,* 515 F.Supp. at 976; *see, e.g., Rothman v. Emory Univ.,* 828 F.Supp. 537, 542 (N.D.Ill.1993) (noting that "[r]etaliation claims are cognizable under the [Rehabilitation] Act"). Furthermore, although the parties do not raise the issue, the Court concludes that Voelkel's informal complaints to Flexman were sufficient to bring her within the scope of the Act's protection. Although the anti-retaliation language from Title VI quoted above may be read as requiring a formal complaint or participation in an investigation, the Sixth Circuit has construed other anti-retaliation legislation broadly to encompass the "unofficial assertion" of rights through workplace complaints. In *Equal Employment Opportunity Commission v. Romeo Community Schools,* 976 F.2d 985 (6th Cir.1992), the court construed the Equal Pay Act, 29 U.S.C. § 206, and determined that it prohibited retaliation for an employee's infor-

mal complaints at work, even if the employee has not filed formal charges with an investigative agency. *Id.* at 989. Unlike the Rehabilitation Act, which on its face arguably prohibits retaliation for unofficial complaints, the Equal Pay Act, by its express terms, only prohibited retaliation against individuals who had (1) filed a Fair Labor Standards Act complaint, (2) instituted an FLSA proceeding, or (3) testified in an FLSA proceeding. *Id.* at 990 (Suhrheinrich, J., dissenting). Nevertheless, the majority concluded that an employee's informal complaints placed her within the scope of the Equal Pay Act's anti-retaliation protection. *Id.* at 989. Similarly, in the present case, the Court concludes that Voelkel need not have filed a formal complaint to seek the anti-retaliation protection afforded by the Rehabilitation Act.

Finally, although the Plaintiffs do not raise the issue, the Court notes that Voelkel's retaliation claim is not precluded because she warned Flexman that his conduct might be violating the ADA, but failed to mention the Rehabilitation Act as well. The protected activity is Voelkel's assertion of Davis' right to an auxiliary aid, and Voelkel need not identify every possible statutory basis for that right. *Cf. Equal Employment Opportunity Comm. v. Romeo Community Schools,* 976 F.2d 985 (6th Cir.1992) (finding that an employee engaged in activity protected under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.,* when she complained to her employer, the school board, and expressed her belief that it was " 'breaking some sort of law' by paying her lower wages than previously paid to male temporary custodians").

**27.** *See* Voelkel depo. at 100–102.

1082 (6th Cir.1994). In an effort to meet their obligation, the Defendants contend that Voelkel's affiliate agreement was terminated because of numerous deficiencies in her work. They note that she received a written reprimand on December 10, 1996, for job performance problems. The reprimand stemmed from a December 8, 1996, meeting involving Jerry Flexman, Janet Flexman and Voelkel. It addressed the following issues: (1) Voelkel's improper removal of files from the office; (2) her untimely completion of paperwork for clients, insurance companies, etc.; (3) her trips between several offices; (4) her need to update her schedule and confirm it with the receptionist; and (5) her lack of promptness for client appointments. (Exhibit K, Defendants' Evidentiary Appendix). Notably, this reprimand preceded the Davises' first visit to the Flexman Clinic on January 26, 1996.

Jerry and Janet Flexman both aver that Voelkel's job performance did not improve after she received the written reprimand. (Jerry Flexman affidavit at ¶ 18; Janet Flexman affidavit at ¶ 11). Furthermore, Janet Flexman has provided an affidavit alleging that Voelkel continued in failing to process paperwork in a timely manner, failing to arrive promptly for counseling sessions, and failing to work effectively with the Clinic's support staff. (Janet Flexman affidavit at ¶ 16–33). This evidence supports the proffered reason for Voelkel's termination. Furthermore, the proffered reason, Voelkel's poor job performance, is a legitimate and non-discriminatory explanation for the Defendants' decision.

■ Accordingly, to avoid summary judgment, Voelkel must present evidence from which a reasonable trier of fact could conclude that the Defendants' non-discriminatory reason is a mere pretext for unlawful retaliation. *Manzer*, 29 F.3d at 1083. Voelkel may satisfy her burden by presenting evidence to show: (1) that the proffered reason had no basis in fact; (2) that the proffered reason did not actually

motivate the Defendants; or (3) that the proffered reason was insufficient to motivate the Defendants. *Id.* at 1084.

■ In her Memorandum opposing summary judgment, Voelkel argues pretext, using each method identified in *Manzer*. *First*, she attempts to show that the proffered reasons had no basis in fact, through the deposition testimony of co-worker Sharon Foley. *Second*, she argues that the timing of Flexman's termination letter demonstrates that the proffered reason did not actually motivate him. *Third*, she contends the proffered reason was insufficient because "similar people were treated differently."

Concerning Voelkel's first argument, the Court finds insufficient evidence to raise a genuine issue of material fact. Foley *did not* testify that Voelkel had no job performance problems. To the contrary, she testified that Voelkel had a tardiness problem, she admitted that removing files from the office could cause problems for other members of the staff, and she acknowledged that her relationship with Voelkel sometimes "was kind of rocky." (Foley depo. at 46–50). More importantly, Voelkel does not dispute that Jerry and Janet Flexman had met with her and issued a written reprimand *before* the Davises ever visited the Clinic. (Voelkel depo. at 36). Voelkel also admits that her lateness for appointments and failure to complete paperwork promptly were important issues to Jerry Flexman, even though she did not perceive the issues as significant. (Voelkel depo. at 33–35). Voelkel also cites no evidence refuting the allegations in Jerry and Janet Flexmans' affidavits that her job performance did not improve after she received the written reprimand. (Jerry Flexman affidavit at ¶ 18; Janet Flexman affidavit at ¶ 11). Nor has Voelkel controverted Janet Flexman's averments about her continued failure, even after receiving a reprimand, to arrive promptly for counseling sessions, and her failure to work effectively with the Clinic's support staff.

(Janet Flexman affidavit at ¶ 16–33).[28] In her deposition testimony, Voelkel admitted that some problems continued despite her "increased efforts." (Voelkel depo. at 38). Viewing the evidence in a light most favorable to Voelkel, she simply has not demonstrated a genuine issue of material fact as to whether the Defendants' proffered explanation for her termination lacks a basis in fact.

Nor has Voelkel demonstrated a genuine issue of material fact using the third method identified in *Manzer*. Under that approach, Voelkel must show that other employees outside the protected class (i.e., employees who did not complain about an interpreter) "were not [terminated] even though they engaged in substantially identical conduct to that which the employer contends motivated its [termination] of the plaintiff." *Manzer*, 29 F.3d at 1084. In other words, Voelkel must present evidence that other individuals who did not complain to Flexman, and who had similar work records, were not terminated. Voelkel's only argument, however, is that "there was no other counselor fired while defending the rights of a person discriminated against in violation of the ADA, [the] Rehabilitation Act and Chapter 4112 of the Revised Code." (Plaintiffs' Response to Defendants' Motion for Summary Judgment, Doc. # 51 at 36). As the Defendants properly note, however, Voelkel's claim misses the mark. The relevant inquiry is whether any "non-complaining" therapists with similar work records were terminated. Voelkel has presented no evidence that Flexman failed to terminate a worker with a work record comparable to hers. The only evidence on this issue comes from Flexman, who avers that he terminated a therapist named Steven Brinkerhoff in 1995 because of his "lateness" and "missed appointments." (Jerry Flexman affidavit at ¶ 3). As a result,

Voelkel cannot avoid summary judgment using the third method identified by the *Manzer* court.

Voelkel also seeks to avoid summary judgment, however, by showing that the Defendants' proffered reason did not actually motivate her termination. Under this approach, a "plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Manzer*, 29 F.3d at 1084.

In the present case, Voelkel alleges that the timing of her termination demonstrates pretext. In support, she contends that Flexman became "angry" with her during a June 3, 1996, conversation about providing an interpreter. (Voelkel depo. at 100–102). Flexman admits that he dictated her termination letter just two days later. (Flexman affidavit at ¶ 20). Voelkel buttresses this "timing" argument by alleging that Flexman did not dictate her termination letter until *after* receiving the June 7, 1996, correspondence from the Davises' attorney requesting a sign language interpreter. In his affidavit, however, Flexman claims he dictated Voelkel's termination letter on June 5, 1996. (Flexman affidavit at ¶ 20). He contends the letter was not transcribed until June 7, 1996. (*Id.*). The letter was not postmarked, however, until June 12, 1996. (Voelkel affidavit at 15–16). Consequently, Voelkel suggests that Flexman did not dictate it until after receiving the June 7, 1996, letter from the Davises' attorney concerning an interpreter.

---

28. In an affidavit, Voelkel avers only that she did not take any files home after December 10, 1995. (Voelkel affidavit at ¶ 4).Voelkel also avers that she "believes" the complaints leveled against her, starting with her repri-

mand and continuing thereafter, were made in response to her questioning of the Clinic's billing practices. She cites no evidence, however, to support this belief.

Even construing this "timing" evidence and all reasonable inferences most strongly in Voelkel's favor, however, the Court notes that suspicious timing alone is not enough to overcome the Defendants' proffered non-discriminatory reason for her termination. The brief time between Voelkel's final complaint to Flexman and her termination *is* sufficient to meet the "causal connection" requirement of her *prima facie* case. As the Sixth Circuit explained in *Manzer*, however, Voelkel must produce some additional evidence to avoid summary judgment. *Manzer*, 29 F.3d at 1084. The *Manzer* court reasoned that "if the bare bones elements of a plaintiff's *prima facie* case were sufficient" to show that the employer's proffered reason did not actually motivate its actions, "the entire 'burden shifting' analysis of *McDonnell Douglas* and its successors would be illusory. No case could ever be culled out after the *prima facie* stage and every case would have to be determined by a jury." *Id.; see also Snapp–Foust v. National Const., LLC*, 1 F.Supp.2d 773 (M.D.Tenn. 1997) (noting that timing alone does not prove a retaliation claim, but may establish the causal link needed for a *prima facie* case).

In any event, after construing the evidence and all reasonable inferences in a light most favorable to Voelkel, the Court finds a genuine issue of material fact about whether the Defendants' proffered reason actually motivated Voelkel's discharge. Although timing, standing alone, cannot overcome an employer's legitimate, non-discriminatory reason for its actions, temporal proximity is "a highly probative factor in retaliatory action cases." *Detroit Edison Co. v. U.S. Dept. of Labor*, 960 F.2d 149, 1992 WL 78108 (6th Cir. April 17, 1992) (unpublished table decision). In the present case, the Court finds the tim-

ing factor particularly probative. Flexman admits terminating Voelkel just two days after she discussed the Davises' request for an interpreter. (Jerry Flexman affidavit at ¶ 20). This timing constitutes strong evidence upon which a trier of fact could rely to find retaliation. The record also reveals that Flexman received a letter from the Davises' attorney on June 7, 1996. (Jerry Flexman depo. at 49). Significantly, his termination letter to Voelkel bears the same date, further suggesting that Voelkel's termination was in response to her requests for an interpreter. (Voelkel depo. at 24).

The record also contains other evidence, in addition to temporal proximity, which could support a finding of pretext.[29] According to Voelkel, Flexman became angry during the June 3, 1996, discussion about an interpreter. (Voelkel depo. at 100–102). Flexman's alleged anger is probative evidence that may support a finding of retaliation. *Yousef v. Borman's Foods, Inc.*, 865 F.2d 262, 1988 WL 138966 (6th Cir. Dec.28, 1988) (unpublished table decision) (recognizing that "employer anger over the employee's protected activity" may suggest retaliation). Furthermore, Flexman has provided two different explanations for his termination of Voelkel's affiliate agreement. In the termination letter, Flexman cited her poor job performance as the reason for his action. In a letter to the Davises' attorney, however, Flexman stated: "Due to our financial difficulties and problems as well as a reorganization of the practice and anticipation of selling my practice, Ms. Voelkel has been given her 30 day notice . . . ." (Doc. # 51 at Exh. 8). The Sixth Circuit has found a genuine issue of material fact when an employer offers "entirely different," albeit benign, reasons for discharging an employee. *Tinker v. Sears, Roebuck & Co.;* 127 F.3d

**29.** The presence of this other evidence enables Voelkel to establish a genuine issue of material fact on the issue of pretext. As noted, *supra*, suspicious timing alone will not defeat an employer's motion for summary judgment. Suspicious timing, in conjunction with some other evidence of pretext, however, may create a jury question concerning the legitimacy of an employer's proffered non-discriminatory reason for terminating an employee.

519, 523 (6th Cir.1997). Flexman may have a legitimate explanation for providing the Davises' attorney with a different reason for terminating Voelkel's affiliate agreement than the reason he provided to Voelkel. His "entirely different" reasons, however, create a genuine issue of material fact for a jury to resolve. A trier of fact could choose to believe either reason, both reasons, or neither reason, concluding that they constitute a pretext for discrimination. Finally, the fact that the Flexman Clinic still refers patients to Voelkel in her private practice raises some question about whether poor job performance actually motivated her termination. (Second Affidavit of Joanne Voelkel at ¶ 8).

■ The Court also finds a genuine issue of material fact regarding the Defendants' argument that they would have terminated Voelkel in any event, because of the Clinic's poor financial condition. In support, the Defendants cite Jerry Flexman's averment that by April, 1998, the Clinic employed only one part-time therapist, two technicians, and three part-time support staff members. (Jerry Flexman affidavit at ¶ 13). They also rely upon Flexman's averment that the Clinic has closed its branch offices in Springfield and Bellefontaine. (*Id.* at ¶ 15). Notwithstanding the Clinic's current employment level, the Court cannot say, as a matter of law, that Voelkel's agreement would have been terminated in the summer of 1996, regardless of her complaints to Flexman. In fact, the Court notes Flexman's averment that the Clinic maintained 15 employees and independent contractors in 1995, the year before Voelkel's termination, and in 1997, the year after her termination. (Jerry Flexman affidavit at ¶ 12).

For the foregoing reasons, the Court finds a genuine issue of material fact precluding summary judgment for the Defendants on Voelkel's retaliation claim. Accordingly, the Defendants' Motion for Summary Judgment (Doc. # 41) is over-ruled as it relates to Count IX of the Plaintiff's amended Complaint (Doc. # 30).

IX. *Joanne Voelkel's Retaliation Claim Under Ohio Rev.Code Chapter 4112 (Count X)*

■ In Count X of the Plaintiffs' amended Complaint, Joanne Voelkel alleges that the Defendants' termination of her affiliate agreement constituted retaliation in violation of Ohio Revised Code Chapter 4112. The Defendants have moved for summary judgment on the claim, contending: (1) that Voelkel's request for an interpreter was not a "protected activity" under state law; and (2) that Voelkel cannot raise a genuine issue of material fact on the pretext issue. (Doc. # 41 at 62). In response, Voelkel argues that she did engage in activity protected by state law, and that she has indeed raised a factual dispute on the pretext issue. (Doc. # 51 at 37).

After reviewing the parties' arguments, the Court finds the Defendants' Motion persuasive. In its prior analysis, the Court determined that Ohio Rev.Code § 4112.02(G), unlike the Rehabilitation Act, imposes no obligation upon a place of public accommodation to provide hearing-impaired individuals with auxiliary aids. As a result, the fact that Voelkel may have engaged in protected activity under federal law does not give rise to a claim under § 4112.02(I). *Crawford v. Medina General Hospital,* Medina Cty.App. No. 2604–M (August 20, 1997). Ohio Rev.Code § 4112.02(I), under which Voelkel brings her state law claim, prohibits retaliation "against any other person because that person has opposed any unlawful discriminatory practice defined in this section . . . ." As a matter of law, Voelkel's request for an interpreter was not a "protected activity" under Ohio Rev.Code Chapter 4112, because state law does not require the provision of auxiliary aids by places of public accommodation. *Cf. Holden v. Owens–Illinois, Inc.,* 793 F.2d 745 (6th Cir. 1986) (reasoning that the plaintiff could not

maintain a Title VII retaliation claim based upon her opposition the defendant's lack of an affirmative action plan, because Title VII did not mandate such a plan). Accordingly, the Defendants' Motion for Summary Judgment (Doc. # 41) is sustained as it relates to Count X of the Plaintiffs' amended Complaint (Doc. # 30).

## X. Joanne Voelkel's Conversion Claim (Count XI)

■ In Count XI of the Plaintiffs' amended Complaint, Voelkel contends the Defendants converted funds owed to her under the affiliate agreement. Both Voelkel and the Defendants have moved for summary judgment on this claim. (Doc. # # 40, 41). For the same reasons the Court has found summary judgment inappropriate for Voelkel or the Defendants on her breach of contract claim, however, the Court also finds summary judgment inappropriate for either party on her conversion claim.

Voelkel claims conversion based upon the Defendants' alleged collection of fees for her work and failure to pay her as required by the affiliate agreement. (Doc. # 30 at ¶ 54). In its prior analysis of Voelkel's breach of contract claim, the Court addressed the same issue and found a genuine issue of material fact precluding summary judgment for either party. As noted more fully above, the record contains evidence from which a rational trier of fact could conclude that the Defendants received compensation for Voelkel's work

and failed to pay her as provided by the affiliate agreement. The record also contains evidence from which a rational trier of fact could reach the opposite conclusion. Consequently, neither party is entitled to summary judgment on Voelkel's conversion claim.[30] The Defendants' Motion for Summary Judgment (Doc. # 41) is Overruled as it relates to Count XI of the Plaintiffs' amended Complaint (Doc. # 30). Plaintiff Joanne Voelkel's Motion for Partial Summary Judgment (Doc. # 40) is likewise overruled as it relates to that claim.

## XI. Conclusion

The Defendants' Motion for Summary Judgment (Doc. # 41) is SUSTAINED in part and OVERRULED in part. The Motion is sustained with respect to Counts I, II, III, V, VII, and X of the Plaintiffs' amended Complaint (Doc. # 30). The Motion is overruled with respect to Counts VIII, IX, and XI of the amended Complaint (Doc. # 30). On Counts IV and VI, the Defendants' Motion is SUSTAINED in part and OVERRULED in part. The Motion is sustained as it relates to Defendant Jerry Flexman, and overruled as it relates to the Defendant Flexman Clinic. Plaintiff Joanne Voelkel's Motion for Partial Summary Judgment (Doc. # 41) is OVERRULED.

Counsel listed below will take note that a telephone conference call has been set for 8:30 a.m. on Thursday, September 2,

---

**30.** The Court also notes that Voelkel's conversion claim is limited to money the Defendants actually received for her work and failed to distribute according to the terms of the affiliate agreement. Under Ohio law, "conversion" is "a wrongful exercise of dominion over property in exclusion of the right of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Zacchini v. Scripps–Howard Broadcasting Co.,* 47 Ohio St.2d 224, 226, 351 N.E.2d 454 (1976), rev'd on other grounds, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977). Furthermore, in *Wiltberger v. Davis,* 110 Ohio App.3d 46, 673 N.E.2d 628 (1996), the Franklin County Court of Appeals noted that "the

scant authority on the subject does suggest that existing law generally allows actions for conversion to be based only upon the taking of identifiable, tangible personal property." *Id.* at 634, citing, generally, *Zacchini,* 47 Ohio St.2d 224, 351 N.E.2d 454; *see also Brod v. Cincinnati Time Recorder Co.,* 82 Ohio App. 26, 77 N.E.2d 293 (1947) ("Conversion of an intangible would seem impossible in the nature of things."). Consequently, Voelkel can recover, under her conversion claim, only funds the Defendants actually received for her work and failed to distribute according to the affiliate agreement's terms, the only funds due and owing to her under the contract.

1999, to reschedule a trial date and other dates leading to the conclusion of this litigation.